MILDRED P. GRACE and HENRY H. HAIRE, as Substituted Trustees under the Will of DAVID FOX, Deceased, Plaintiffs, *v.* CORN EXCHANGE BANK TRUST COMPANY, Defendant.

Supreme Court, Special Term, Kings County, May 11, 1939.

*Medina & Sherpick* [*Eugene A. Sherpick, William Gilbert* and *James J. Regan* of counsel], for the plaintiffs.

*Laughlin, Gerard, Bowers & Halpin* [*Frank C. Laughlin* and *John J. Halpin* of counsel], for the defendant.

LOCKWOOD, J. David Fox of Suffern, Rockland county, N. Y., died in 1925 leaving a will naming his brother, George S. Fox, executor and trustee and providing that, in the event of his brother's death or disqualification, the successor trustee should be one Chessman Kittredge.

The will was duly admitted to probate and George S. Fox qualified as executor. Mr. Fox carried out the provisions of his brother's will, accounted, set up the trust as directed, and acted as trustee until his mental faculties became impaired in the spring of 1930, when, by decree of the Surrogate's Court of Rockland county, made

June twenty-fourth of that year, he was removed and Chessman Kittredge designated as successor trustee.

The will provided that the trustee serve without bond, but Kittredge insisted upon filing a bond for $60,000 of the National Surety Company. That company promptly notified the defendant it would countersign all checks, but just as promptly the new trustee had the request and requirement withdrawn.

The assets in the trust turned over to Chessman Kittredge upon his qualification were promptly checked, audited, valued and listed by Perley Morse & Company, accountants employed by him, as shown by the following statement:

ESTATE OF DAVID FOX, DECEASED
STATEMENT OF ASSETS AND LIABILITIES
June 24, 1930
Assets

| | | |
|---|--:|--:|
| **Cash:** | | |
| Suffern National Bank | $7,586 19 | |
| Emigrant Industrial Savings Bank | 612 73 | |
| East River Savings Institution | 539 86 | |
| Irving Savings Institution | 24 61 | |
| Cash on hand | 50 75 | |
| Total cash | | $8,814 14 |
| **Securities:** | | |
| American Brake Shoe and Foundry common, 4,162 shares | $104,048 00 | |
| American Brake Shoe and Foundry preferred, 50 shares | 5,050 00 | |
| American Arch no par, 600 shares | 72,600 00 | |
| Superheater Company, 7,500 shares | 208,500 00 | |
| Suffern National Bank and Trust Company, 14 shares | 1,050 00 | |
| Suffern Amusement Company preferred, 5 shares... } | 625 00 | |
| Suffern Amusement Company common, 5 shares.... } | | |
| Island Oil and Transport Company, 166 4/6 shares | 1 66 | |
| Pioneer Mining Company, 450 shares | 34 50 | |
| Fortuna Consolidated Mining, 1,000 shares | 10 00 | |
| Houvenkoph County Club bond, $200 par | 200 00 | |
| Denver and Rio Grande R. R. preferred, 250 shares. | .......... | |
| Total securities | | 392,619 16 |
| **Securities in trust for Nancy T. Fox:** | | |
| 44 shares American Brake Shoe and Foundry preferred | $5,251 00 | |
| $750 demand note, Suffern Savings and Loan, dated February 14, 1930, 5% | 749 00 | |
| $4,000 guaranteed first mortgage certificate | 4,000 00 | |
| Total securities in trust for Nancy T. Fox | | 10,000 00 |
| **Real estate:** | | |
| Homestead (half interest) | $25,000 00 | |
| Burpo property | 5,000 00 | |
| Total real estate | | 30,000 00 |
| Furniture and fixtures (half interest) | | 1,262 12 |
| Personal effects | | 724 40 |
| Estate of David Fox and George S. Fox | | 356 32 |
| Total assets | | $443,776 14 |

Kittredge sold some of the foregoing securities, made reinvestments, and acted as successor trustee until he died a bankrupt and a suicide on May 3, 1936. Meanwhile, the National Surety Company, which was on his bond as trustee, had gone into liquidation in 1933 and its successor, National Surety Corporation, filed a new bond in the same amount.

Thereafter, on June 3, 1936, the court appointed the plaintiffs, Mildred P. Grace and Henry H. Haire, as substituted trustees. The only assets of the trust estate which have come into their hands are:

ESTATE OF DAVID FOX, DECEASED
Assets Received

Cash:

| | | |
|---|---:|---|
| Emigrant Industrial Savings Bank | $612 73 | plus interest |
| East River Savings Institution | 539 86 | plus interest |
| Irving Savings Institution | 24 61 | plus interest |
| Cash on hand | 6 00 | |
| Total cash | | $1,183 30 |

Securities:

| | | |
|---|---:|---:|
| American Brake Shoe and Foundry common, 62 shares | $1,150 60 | |
| Suffern National Bank and Trust Company, 14 shares | 1,050 00 | |
| Suffern Amusement Company preferred, 5 shares... Suffern Amusement Company common, 5 shares.... | 625 00 | |
| Island Oil and Transport Company, 166 4/6 shares. | 1 66 | |
| Fortuna Consolidated Mining, 1,000 shares | 10 00 | |
| Pioneer Mining Company, 450 shares | 34 50 | |
| Houvenkoph County Club bond, $200 par | 200 00 | |
| Denver and Rio Grande R. R. preferred, 250 shares. | .......... | |
| Total securities | | 3,471 76 |

Real estate:

| | | |
|---|---:|---:|
| Homestead (half interest) | $25,000 00 | |
| Burpo property | 5,000 00 | |
| Total real estate | | 30,000 00 |
| Furniture and fixtures (half interest) | | 1,262 12 |
| Personal effects | | 724 40 |
| Estate of David Fox and George S. Fox | | 356 32 |
| Total assets received | | $36,997 80 |

From this list it will be seen that all of the reinvestments and many of the original assets in the trust had been disposed of.

Mildred P. Grace and Henry H. Haire, as substituted trustees, bring this action to compel the Corn Exchange Bank Trust Company to account for $242,825 which they allege Chessman Kittredge, as successor trustee, wrongfully diverted from his trust account in said bank to his personal account and use, for $4,000 of bonds of J. H. Newberry & Company which they allege Kittredge wrongfully took from the trust assets and pledged with the bank as collateral for a personal loan; that the bonds were redeemed, the bank receiving $4,080 which it credited against Kittredge's personal loan. They

also ask from the bank $138,978.60, a loss sustained by the sale of estate securities by the trustee at sacrifice prices at times when, for the purposes of the trust, there was no necessity of selling securities, such sales having been made solely to aid Kittredge to misappropriate the proceeds.

The trust with which we are here concerned was created by the decedent, David Fox, for the benefit of his only child, Marie Louise Fox, who was seven years old at the time of her father's death in 1925, and is now twenty-one, married, and known as Marie Louise Van Bomal.

Chessman Kittredge was a lawyer not in practice. He was active as secretary of a chain of camps for boys and girls and as an officer of Tompkins & Bevers, Inc., and Hudson River Yards, Inc., dealers in building materials. His office was a modest one on Madison avenue near Forty-second street, where he had one employee, a stenographer-secretary. He did not do his banking with the branch of the Corn Exchange Bank Trust Company around the corner from his office, or with any of the many other banks located in Midtown Manhattan. He kept his personal and corporation accounts in the branch of the Corn Exchange Bank Trust Company at Eighty-sixth street and Lexington avenue, of which his friend and neighbor at home in Tarrytown was then branch manager.

Upon qualifying as successor trustee, Kittredge went to the bank on July 17, 1930, and, as required by its rules, filed with it a copy of the decree appointing him, and a copy of the will, and opened an account as " Chessman Kittredge, Successor Trustee under the Will of David Fox, deceased." At that time he had a personal account " Chessman Kittredge " and his corporation, Tompkins & Bevers, Inc., had an account in the same branch of the same bank. Both accounts were then indebted to the bank for notes discounted. The Tompkins & Bevers, Inc., note for $100,000, reduced to $85,000, bore the individual indorsement of Chessman Kittredge. In the personal account he had discounted his note for $35,000. Another Kittredge company — Hudson River Yards, Inc.— also had an account and at times discounted notes indorsed by Kittredge.

Detailed analyses of the accounts of Chessman Kittredge, as successor trustee, and of his individual account with said branch bank, are in evidence.

Between July 17, 1930, and May 3, 1936, there was deposited in the trust account a total of $431,933.12. At his death the balance in it was $300.64. In all about 450 checks were drawn on this account. Of this number, 146 were to his personal order; 140 of these for $234,525 were deposited to his personal account in the same branch of the same bank.

The other six were: Four checks aggregating $3,400, drawn to his order and deposited to his personal credit in other banks, and two checks amounting to $4,900, drawn to his order and deposited to the credit of his corporation, Keewadin in Florida, Inc., making a total of $8,300. These six checks, all drawn on the trust account to his personal order, were honored and paid by the defendant bank. The total of the 146 checks so drawn and paid out is $242,825.

During his trusteeship, Kittredge sent a check for $573 monthly to the beneficiary or her mother and paid for chauffeur's salary and other items.

The analysis of the individual account for the same period — July 17, 1930, to May 3, 1936 — shows total deposits $297,080.88, of which $234,525, or about seventy-eight per cent, were checks drawn on the trust account to the order of Chessman Kittredge and deposited in his personal account in the same branch of the same bank.

Of the withdrawals from the personal account, checks as follows were to or for the account of the beneficiary:

| | |
|---|---:|
| Stationery for Fox estate | $2 25 |
| Real estate tax penalty, Fox property | 2 47 |
| Check to Marie Louise Fox | 25 00 |
| Cash wired from Florida to Marie Louise Fox | 250 00 |
| Check on personal account, deposited trust account | 100 00 |
| Same | 600 00 |
| Same | 150 00 |
| Same | 250 00 |
| Total | $1,379 72 |

During his service as trustee, Kittredge purchased through a banking house, nine $1,000 Consolidated Gas bonds. The sale of eight of these bonds for a little under par was traced through another banking house, whose checks for the amount due were deposited in Kittredge's personal account in defendant bank. From the amount so deposited, he drew two checks, one for $1,000 and one for $800, on his personal account, and deposited same in his trust account.

All other withdrawals from the personal account were for Kittredge's private purposes.

The trust account was opened July 17, 1930. The diversion of funds started shortly thereafter. On September 11, 1930, Kittredge as trustee drew a check to his personal order for $5,000 on the trust account and deposited it to his credit in his personal account.

On September 26, 1930, another similar transaction, amount $2,000, and October 21, 1930, another for $3,000.

In October, 1930, the bank demanded more security for the Tompkins & Bevers, Inc., note and Kittredge secured the additional indorsement of his father-in-law, who ultimately was sued by the bank and paid the balance then due of $40,500.

On November 14, 1930, Tompkins & Bevers, Inc., of which Kittredge was an officer and substantial stockholder, had a balance of $435.57 in the Eighty-sixth Street bank. On the Tompkins & Bevers, Inc., note indorsed by Kittredge personally, then due, there was unpaid $85,000; the branch had demanded a reduction payment. On the preceding day, Kittredge, with $57.13 balance in his personal account, drew a check for $6,000 on the trust account to his own order and deposited it in his personal account. Then he drew a check on his personal account for $5,000 to his Tompkins & Bevers, Inc., and deposited it to that company's credit; and his Tompkins & Bevers, Inc., drew the bank a check for $5,000 on its account and paid it on account of its $85,000 indebtedness to the bank. All these checks were drawn on, and deposited in, the same branch bank.

On November 29, 1930, Kittredge personally owed the branch bank $35,000 on his personal note, on which interest for November, amounting to $160.41, was about to become due. His personal balance was $72.33. On November 26, 1930, he drew a check for $1,000 on the trust account to his personal order, deposited it in his personal account and then had sufficient funds therein to allow the bank to debit his account with the amount of interest due it.

On March 30, 1931, his personal account was overdrawn $361.61. The next day he drew two checks on the trust account to his personal order, one for $500 and one for $1,500, deposited them in his personal account and the overdraft was made good.

On September 22, 1931, the branch bank called for payment of $5,000 on account of Kittredge's personal indebtedness to it of $35,000. His personal balance was then $1,421.41. He promptly drew a check to his own order on the trust account for $5,000, deposited it to his personal account and reduced the loan, as requested, to $30,000.

The transactions just referred to in detail are four out of fifty, all of which relate to checks drawn on, and deposited in, accounts in the same branch of the same bank where the defendant bank, by the diversions noted, came into possession of funds from the trust account. The other ninety-six are where the checks were drawn by Kittredge to his personal order on the trust account, and

deposited to his personal account, and drawn out by checks for his personal obligations, such as life insurance premiums, living expenses and school bills for his own children, except the few before noted, paid to or for the beneficiary.

The diversion of the funds by Kittredge to his own use started about two months after his appointment, and continued month after month until he committed suicide on May 3, 1936.

The mere acceptance by the defendant of trust funds for deposit to his personal account — the checks of September 11, 1930, for $5,000; September 26, 1930, for $2,000, and October 21, 1930, for $3,000 — did not affect their character as trust funds which remained equitably assets of the trust estate. At this point there was no liability imposed on the bank, for, on the record here, it was then justified in assuming Kittredge would apply these funds to the purposes of the trust.

But beginning with the transaction of November 14, 1930, when Kittredge drew a check for $6,000 on the trust account to his own order and deposited it in his personal account for the purpose of paying to the bank part of the $85,000 indebtedness of his Tompkins & Bevers, Inc., the bank was informed that Kittredge was depositing in, and building up his personal account through checks drawn by him on the trust account. This and the later transactions charged the bank with notice that the trust funds so transferred to his personal account were being used to meet the bank's demand for payments to reduce his personal, and his corporation's, loans to it, — to pay interest on his loans — to make good overdrafts on his personal account, and to pay his living and other expenses. The trust funds so diverted were practically all thus consumed by checks on accounts in this branch of the defendant bank.

The bank was alert to keep its loans to Kittredge and his companies amply secured, as evidenced by its demands for more indorsers, for reduction payments, for additional collateral and for interest on the obligations. It also noted overdrafts mechanically and manually and saw to it that they were promptly made good. It examined and inspected all deposit slips and all checks deposited and drawn, for dates, amounts, names of payees, name and signature of payor and correct indorsements.

The diversion of $6,000 on November 14, 1930, was one which plainly routed trust funds in the bank to Kittredge's personal account in the same bank, and immediately to the same bank in payment of Kittredge's direct or contingent liability to it. Thus, the bank acquired an advantage and benefit direct through the diversion and also acquired knowledge of what was going on. This

applies to the many other transactions thereafter, where it quickly received and diverted funds to pay on account of loans, for interest, or to make good overdrafts; also to the withdrawal of large sums from the trust account by Kittredge, transferred to his personal account for plainly personal reasons.

The same employees kept and supervised both the personal and trust accounts under " K."

Under the authority of *Bischoff* v. *Yorkville Bank* (218 N. Y. 106) and cases there cited, this court holds that, inasmuch as the defendant knew that the credits to Kittredge's personal account created by the proceeds of the checks were of a fiduciary character and were so owned by the trustee, it had not the right to participate in the diversion of them from the trust estate or from the proper purposes under the will, a copy of which it had required Kittredge to file with it when he opened the trust account.

Its participation in a diversion of them resulted from its (a) acquiring an advantage or benefit directly or through or from the diversion, and (b) joining in a diversion in which it was not interested, with actual notice or knowledge that the diversion was intended or was being executed and thereby becoming privy to it.

On November 14, 1930, through the transactions of that date, the bank knew, or should have known, that Kittredge had appropriated $6,000 of the trust funds for his private benefit. The presumption that he would apply the moneys to their proper purposes ceased to exist. There was absolute proof in the possession of the defendant to the contrary. It had knowledge of such facts as would reasonably cause its employees to think and believe that Kittredge was using the moneys of the trustee for his individual advantage and purposes, through a method or system by which thereafter the substantial part of this trust estate was converted and embezzled.

Having such knowledge, it was under the duty to make reasonable inquiry and endeavor to prevent a diversion. Having such knowledge, it was charged by the law to take the reasonable steps or action essential to keep it from paying to Kittredge as his own the moneys which were not his and were the trustee's, and was bound by the information which it could have obtained if inquiry on its part had been pushed. It apparently did nothing, and by paying, under the facts here disclosed, the subsequent checks of Kittredge, became privy to the misapplication.

The bank officials say that in this branch a comparatively large volume of business was handled daily by a few modern business machines operated by a minimum number of employees.

There was no rule requiring subordinates to report trustees or executors drawing checks on a trust account to their own personal order. They did have a regulation requiring machine operators and tellers to report to their superiors, officers of corporations drawing checks on corporation accounts to their personal order. The court is at a loss to understand how this latter rule could have been enforced, if the testimony of the officers as to bank operations is to be relied upon.

They said that, although checks deposited were carefully examined as to date, payee, amount, signature of payor and indorsement on the back, each line was examined at a different time and it was unlikely that the employees making such inspections would know that Kittredge was drawing check after check to his personal order on the trust account, and depositing them in his personal account, although his name as payee appeared on every one of the checks less than one inch above his signature, under which was printed " Trustee of the Estate of David Fox." Furthermore, each check had printed on the face at the end, the following: " Chessman Kittredge, Trustee, 331 Madison Avenue."

If said testimony is correct, how could they have complied with their rule as to checks drawn on corporation accounts to the order of individual officers? Such checks were examined the same as trustee's checks.

The method of conducting the business was apparently planned to keep collateral adequate, see that interest on loans made by the bank to depositors was collected when due, have overdrafts promptly made good and keep a sharp lookout for bad checks and forged signatures and counterfeit money. It seems watchfulness was subordinated to economy; that the emphasis was upon volume and the reliance upon the machines with the number of employees too few. Apparently no defense was set up against a depositor who transferred via many checks, month after month for over five years, thousands of dollars of trust funds to his personal account and then, by check on his personal account, withdrew said funds for his private purposes — all in the same branch bank. Though this was done boldly and openly, the bank contends it was unaware of what was going on until the death, by suicide, of this bankrupt trustee. Only then, the bank claims, did it learn that the cash and securities in the trust set up by the decedent for the protection of his child had been practically exhausted. She had received, monthly, part of what should have been the income; an amount equal to about half the principal had been misappropriated as outlined and the other half by selling the estate's bonds through other agencies.

Among other things, the defendant urges that the rule expressed in the *Bischoff* case has been questioned and criticized by the courts of other States, text writers, and professors of law, including Professor Scott of Harvard Law School in his recent work " Scott on Trusts," soon to be published, wherein it is stated that the decision in *Allen* v. *Puritan Trust Co.* (211 Mass. 409; 97 N. E. 916), holding that the bank's liability is limited to the amount of the checks used in discharging the depositor's individual liability to the bank, is preferable to the New York rule.

However, such arguments are of no avail, as this court is bound by the pronouncement of the Court of Appeals, and the defendant must now pay to the plaintiffs the moneys of the trust estate which Kittredge diverted on and after November 14, 1930, when knowledge of the misapplication was plainly brought home to it.

| | | |
|---|---|---|
| The 143 checks drawn on and after November 11, 1930, and so converted total.... | $232,825 | |
| Amount received by the bank on the redemption of the fourth J. H. Newberry & Co. $1,000 bonds, converted in 1932 and deposited with the bank as security for personal loans, amounted to....... | 4,080 | |
| The plaintiff is entitled to judgment for the total of these amounts with interest at six per cent from the respective dates of misappropriation.................... | ........ | $236,905 00 |
| *Less:* | | |
| The payment for trust purposes and for the beneficiary and the transfers from the personal bank account to the trust account with interest thereon from the respective dates of transfer............ | ........ | 1,379 72 |
| Defendant's net liability for cash embezzlement subject to interest adjustments heretofore mentioned................ | ........ | $235,526 28 |

Plaintiff's claim for stock losses totaling $138,978.80, the loss to the estate caused by Kittredge's sale of said securities at sacrifice prices, when there was no need for making said sales except to misappropriate and embezzle the funds, is disallowed. These losses resulted solely from the trustee's misconduct, and none of the sales were made to, or through, the defendant bank. In so far as this record discloses, it had no knowledge of them.

The claim for $4,080, the amount paid to the bank in redemption of the Newberry bonds hereinbefore allowed, rests upon an entirely different basis. There is no dispute that the bonds were trust property and the plaintiffs have clearly traced the proceeds of their redemption in the assets now held by the bank for the credit of Kittredge.

The foregoing constitutes the written and signed opinion upon which judgment in this action shall be entered. Therefore, it is unnecessary to pass upon the proposed findings of fact and conclusions of law. (Civ. Prac. Act, § 440; Rules adopted by Board of Trial Justices, Second Judicial District on January 26, 1937.)

Settle judgment on five days' notice.